for the day is number 07-4297 Munoz et al. v. Cityof Philadelphia et al. Mr. Gottlieb and Mr. Golden. Good afternoon. Good afternoon. My name is Craig Gottlieb, representing the appellants. I would like to reserve three minutes for rebuttal. Granted. In our briefs in this case, we identified three independent arguments in support of reversal. I'd like to spend my time today focusing on two, the private right of action argument and the causation argument, and if any time remains, then focus on the notice-trigger argument. Why don't you start with causation? Okay. Causation. I'd like to highlight two different points of causation. I mean, if you win on causation, we don't have to get to the private right of action. That's correct. If you win on the private right of action, you don't have to get to causation. Both are true. Usually we try to avoid the constitutional issue if we can. Well, that's simply a statutory interpretation issue. There's no, we don't. Whether there's a private right of action? Correct. Don't you have to look at Gonzaga and all that? Correct. Correct, which, but I don't believe they're interpreting the Constitution in this. I'm sorry. I know what you're saying. Okay. You're right. But I'll start with causation. I'd like to make two points about causation. First, the plaintiffs in this case failed to identify even one witness who would testify that he stopped shopping at the market because of rumors of a condemnation. I recognize that this is a verdict, and that juries are given respect in determining fact questions like causation. But if there's ever a case where the jury's verdict is unsupported by the facts, it's this case. They couldn't identify even one witness who would testify that they stopped shopping because of the rumors. And the inference itself is a flimsy one. There's no reason to suspect that somebody may stop shopping at a market because of rumors. Because of what? Because of rumors. If you could find a good piece of fruit for a good price, I don't think you're going to really worry so much about what the specific intentions of the owners are. I thought there was evidence that the owners said that the customers were getting mad at them somehow. The owners said that. I thought they were profiteering, I guess, or something. It's a strange way to profiteer. You end up going broke, but that's what I thought the evidence was. Well, that is correct, Judge. Two points about that. One is it is a strange way to profiteer. But two, the evidence is that the owners testified that people weren't coming because of rumors of a condemnation. But that's clearly hearsay. I don't think anybody disputes in this case that that's hearsay. What's also given is that not one independent person testified on their own and said, yeah, I stopped shopping there because of rumors. They couldn't find one person who would come in and testify to that. Not one person that we could cross-examine and find out if that was the real reason they stopped shopping. Is that the real reason they stopped shopping? What kind of things did they sell in that market? They had a deli, produce, and I believe a garden center. A garden center. A garden center, yes. And that's sort of just one side of the equation. We think for that reason alone they can't support their burden of proven causation. But even apart from the fact that their explanation is a flimsy one that's not supported by evidence, there's a whole host of reasons that are undisputed in this case as to what the problems were with the market. No matter how flimsy you might think it is, it was they did get to a jury and they did get a verdict. Right, but that verdict needs to be supported by a reasonable jury. It has to be able to uphold the verdict. Why would the jury have given them a verdict? I mean, what was it that the jury, I mean, it's a speculation for you to say that, but the jury must have figured that they were just sorry for them. It could be. They could be sorry for them. They may not like condemning authorities. That could be anything. But all we have to our advantage is the record. That's all we can look at. And we know from the record that not one person said, I'm not coming there because of rumors. There's not one person who said that. Couple that with the undisputed testimony of a litany of independent problems with the market. There were problems with Parkview. There were problems with Acme. There were problems with hostility from the prior owner. There were problems with Mr. Minerage's illness. There were problems with food stamp machines. They had a whole host of problems. Well, did you make a motion for a judgment as a matter of law on that basis? Correct, yes, we did. And what did the district court say? Obviously, the district court said no. Yes. But what did the district court say by way of, you know, like an explanation? The explanation was causation is a question for the jury. You can't actually evaluate the evidence, which is what I'm asking this court to do. So when you combine the flimsy support for the lack of support for the plaintiff's preferred reason, that there's not even one witness who would say, that's why I stopped shopping. You couple that with the undisputed evidence, 6, 7, 8, 9, 10 reasons of problems with the market. Keep in mind that plaintiffs claim that the defendant's obligations started in September of 2002. We claim that they didn't start until much later. But if you accept the plaintiff's legal version of the facts there, if the obligations started in September of 2002, what's also undisputed is they couldn't pay their mortgage as of July of 2002. So by July of 2002, they couldn't pay their mortgage anymore. They couldn't pay their debts. It has nothing to do with anything that the city did. So for these reasons, we don't think that the verdict is supported by the evidence. In addition to that, there's one other troubling factor for the plaintiffs. Their theory is that there were these rumors out there. But the rumors have to come from, have to be caused by the city. There can't be a liability in this case. The plaintiffs themselves admit that the rumors started in August, they purchased the business in August of 2001 and the rumors started thereafter. They don't attach any city liability for another 13 months until September of 2002. But the rumors were percolating throughout those 13 months before any city, any alleged city liability. So for 13 months, there were rumors anyway. So on top of all the causation problems that I identified, plaintiffs have to finally parse the rumors which were not proven anyway or that were not proven were a cause of the demise anyway. The rumors have to be specific to the city's actions, which can only have happened after September 2002 anyway. So for these reasons, they failed to prove causation. Independent of all this, let's say you reject all that and you say, plaintiffs proved that rumors were the cause of the demise. There's another fundamental causation problem. The fundamental causation problem is that they need to show that even if they had been given notice, there was something they could have done with the business. This is speculation on their part. They offer two theories as to what they would have done with the business had they gotten notice in September of 2002 or April of 2003, the dates that they ask. Had they gotten notice at those points in time, plaintiffs claim that they either would have sold the business or they would have relocated. But they didn't support either one of those theories with any proof. And let me talk about each of them individually. The selling the business theory. The selling the business theory, apart from a lack of proof, simply doesn't make sense as a matter of logic. Because the buyer would have the same problem. Right. In fact, it would be even worse because. And they would have an obligation in today's world to tell the buyer what the situation is. Because that would be enough basis for a lawsuit against them. Correct, Judge. But they wouldn't even have to tell the buyer because in their theory of the case, they would have gotten notice. So the buyer would know already. The notice would be, in their theory of the case, it's not just rumors, it's notice. So that would only make it worse. Or at least it wouldn't be helping them. So there's no way they could resell. There's no way that they could claim that they were hurt by the inability to sell. So if you look at the relocation theory, there's a serious lack of evidence in that. Sometimes you get cases, though, where it becomes very difficult for a person with a particular property to sell it because potential buyers know that it might be taken. And then you get into questions of at what point is there actually a constructive taking. And you do get cases like that, though. They write a letter, you know, we're thinking about taking your property for this new road. Well, that causes the owner a big problem at that point. Because then if he tries to improve the property, they say, well, you shouldn't have improved it because you knew what was coming and you can't sell it. It kind of happened. Judge, I completely agree. That's actually our argument. They're claiming that had they gotten this notice, it would have helped them. At some point, the notice was entitled to them under the Act. At what point? If I may correct the phrasing of that question just a little bit, Judge, I don't think the Act ever gave them an entitlement to notice. And this is just going back to the private right of action issue. But what did happen is they did. What does the Act say, then? The Act doesn't say anything about notice. That's our private right of action issue. My point is, what does the Act say? The Act says that they get moving expenses, they get search expenses. The Act also says that it identifies some policy points that the government agencies are supposed to recognize problems as soon as possible and solve the problems. That's the 4625A, sort of the centerpiece of Plaintiff's case. But there's not any indication in the Act whatsoever of a notice requirement. In some ways, the whole Gonzaga inquiry is you don't even need to reach that inquiry in this case because – It's not so much the Act, but look at the regulation. It says, as soon as feasible, the owner shall be notified of the agency's interest in acquiring the real property. Yes. I mean, regulations can also give possibly private rights. So there is a requirement. My question to you was under the regulation, then, as opposed to the Act, which talks about as soon as feasible, the owner being notified of the interest in acquiring the real property. When did that kick in?  But, Judge, I do need to go back to the premise of your question. I don't think there are any situations where the regulation can give rise to entitlements. I think this – It just says the regulation states, as, quote, as soon as feasible, the owner shall be notified of the agency's interest. Not that it's going to, but interest in acquiring the real property. My question to you is when does that kick in? Under the regulation, that kicked in when the mayor signs the ordinance. But the ordinance, that's already a done deal, then. It's not an interest. We're beyond interest, right? No, it's not a done deal at that point. Lots of things can then happen. In fact, the actual declaration of taking, in this case, didn't occur for, I think, about a year later. But there are lots of things that can happen between. What was it that the mayor signed that showed interest that didn't happen before? What did the mayor sign, actually? He approved it. He signed the ordinance. And what did the ordinance say? The ordinance said that the city approves the – I mean, the ordinance is in the record, but it says that the city approves the taking of – And this was in July of 2004? Correct. But then the RDA still has to acquire the funding to do it. There are lots of times when a mayor will sign an ordinance and then the property is never ultimately taken. When were they first told that their property was implicated? I'm sorry. When were they first told that their property was implicated? They were told about six weeks before that notice. Did they receive a letter that contained a plan that did not include their property? Well, they heard from the community that they had received a couple of plans that some did, some didn't include the property from the community. But that was an official notice. But, judges, and I apologize here, but I think we're putting the cart before the horse a little bit because as this court has held in the South Canyon case and in the Three Rivers case, a regulation cannot support a right. We don't even need to get to the regulation until we find the right in the statute itself. This is quite similar to the SABRI, isn't it? I mean, the case that also would help you would be Newark Parents. Exactly. Possibly. But SABRI doesn't help you. SABRI doesn't help us. But SABRI wasn't a regulation case. SABRI was a statutory interpretation case. It was interpreting the language of Title 19. We said in South Jersey, that was a terrible case. Southampton? I don't have the opinion. South Jersey Citizens versus New Jersey Department of Environmental Protection, that the regulation, quote, cannot create a right enforceable through Section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation. Correct, Judge. Are you saying that's the situation? That's my point. That's my point. If you don't find it in the statute itself. The regulation can't create a cause of action. The regulation's irrelevant if the right's not to be found in the statute itself. You may have to do it, but it's not going to create legal liability to the individual. Exactly. And we do do it. We do give notice, but if there's some sort of failure to give the notice, then it's not going to create legal liability. And it's that case, which, correct, Judge, and Judge Ember, you were on that panel as well. I remember it well. That says that you don't even need to look at the regulation if you don't find the right in the statute. That wasn't my question to you as to whether it conferred an individual right. When does it kick in? Right. Okay. You thought I was asking another question. Okay. I apologize. Yeah, but the statute does say provides for the resolution of such problems in order to minimize adverse impacts on displaced persons. Correct. How do you minimize adverse impacts on displaced persons and claim you don't have to give them notice when you know their property's going to be taken? There are many ways that you could minimize adverse impacts on displaced persons. You could internally plan to minimize adverse impacts on displaced persons. You could gather your relocation assistance and then, for subsequent in the process, give them the relocation assistance. Judge, it would be extraordinary for that language under Gonzaga to be an unambiguously conferred right to notice. Remember, that's the standard under Gonzaga, an unambiguously conferred right. And the language that you just read to me doesn't even mention the word notice. Actually, this property never was taken, was it? I'm sorry? The property never was taken. Well, it was eventually taken after the business closed. Wasn't there a foreclosure? Correct. Sovereign Bank. Who was it taken from, the bank? Correct. So it wasn't taken from them. Correct. Thank you. We'll get you back in rebuttal. Good afternoon. James Goldin for the Munozes. First, I'd just like to respond to one thing that Mr. Gottlieb said with regard to what the Munozes said they would have done had they gotten notice at a time when it made any difference to them. That really hits on the issue that I have, particularly that I have, whether the lack of notice here actually injured the Munozes. Yes. And how. I mean, it seems to me like there was a lot of uncertainty, but there was a lot of uncertainty in the air. Culbertson was trying to find what was going on, and he was meeting with various people, and it was in and it was out, and they were interested, and we're going to need it. We don't know if we need it. Culbertson wasn't trying to find out what was going on. Culbertson knew exactly what was going on. Culbertson was the one who was creating all of the confusion in the air, the sequence, and what the Munozes could have done. Are you talking about at the beginning? At the beginning he didn't know. He was trying to find out. I mean, maybe in 04 he might have had a pretty good idea. In September of 02 was the first time that the people in the city, including Culbertson, decided that the Munoz property needed to be taken. In April of 2003, the decision was finally made. In May of 2003, the two site plans were prepared, one with the Munozes and one without the Munozes. You're talking about September of 02, the McCullough meeting? Yes. That was September of 02. My understanding was that Deborah McCullough met with Herb Wetzel and others. Wetzel was with the Philadelphia Redevelopment Authority, and they discussed these possible changes to the Frankfurt proposal. Yes. And what would make it a better candidate for funding. Is that correct? That is correct. And they talked about whether the Munoz property was necessary to make the project work. But that's pretty general, isn't it? Yes. In September of 02, it was. And they made no decision, did they? Well, what they said, what Deborah McCullough wrote in her notes, is need to acquire entire triangle. Now, the need part means they need it all. The next step, this was September of 2002. In October of 2002, they told the City Planning Commission to do what they're supposed to do. Well, if that's the case, then why in January of 03 did the RDA prepare a redevelopment proposal that did not include the Munoz property? In January of 2003. Because in January of 2003, the final decision hadn't been made by the city about the form of the application that they were going to make. And the reason had to do with the amount of money that was available, and although this was not a big issue in the case, it was part of the testimony, they needed state money. The state funds that they were going to contribute to this project had a prohibition against their use for condemning going businesses. So, in the first part of 2003, they deliberately left the Munoz property out, as well as the contractor next door, whose name is escaping me. That was also a going business. They prepared the two site plans. They got the approval from Wetzel. They got the approval from the city councilman, whose money was going to be contributed to this. That was April of 2003. May of 2003, they submitted the application for funding to the state agency. In that application, they only submitted one of the two site plans, the one that excluded the Munoz's, at the same time as in the narrative, consistent with what they had decided in September, consistent with what they had decided in April. The narrative said, the area that we're going to condemn includes a small farmers market. But when was it? Because I said to you, the RDA put something out in January of 2003 that did not include the Munoz property. Culbertson then, in April of 2003, goes to Councilman Marino and lobbies for the inclusion of the Munoz property. Correct. And the decision was made. But he didn't get an answer that day, did he? Within a week, he got an answer. And it was in response to – and the answer was, yes, include the Munoz property. And it was in response to that answer in April of 2003 that in May, I think it was May 4th, two site plans were prepared, one with the Munoz property and one without. Sounds like it's still uncertain, isn't it? A final decision had not been made. That's absolutely right. And the point is, under the statute and the regulations, which are consistent with the statute, so under three rivers, they provide support for a 1983 right. But the key to the statute is, the statute and the regulations, collectively, the law, the key is that notice has to be given to a homeowner when, as Your Honor said, as soon as feasible, when an acquiring agency is considering property. And the reason for that is exactly what happened in this case. And that is, there is tremendous uncertainty. So then a property owner has information about what might happen. And he can decide, well, should I renew the lease? Should I repave the parking lot? Should I fix the roof? And this gets to the point where I started. I want to correct a misstatement that Mr. Gottlieb made. Mr. Munoz in court never said that one of his alternatives was to sell the business. Mr. Gottlieb and I think Judge Weinberg pointed out that would be illogical. That's not what he said. What he said is he would try to sell the real estate and move the business. But where would he relocate to? Was there any evidence put in it as to where he would relocate it? Other than somewhere in the neighborhood. He would have looked for someplace in the neighborhood where the name Nino's, which had been a fixture in the neighborhood for a very long time, would still have value. The irony of the difficulty of proof is what the city is saying here. What the city is saying in court is we didn't tell you, Mr. Munoz, what we were supposed to. We very deliberately didn't tell you because we don't like the consequences of when we tell people what we're going to do. Then the city says to us when we're at trial in 2006, I think, well, tell us what you would have done. Where's the real estate? And the Munoz's answer is, well, it's your job, city, to tell us in 2002 or 2003 that the property may be condemned and provide for us advisory services so we can find a new location. By that point, by the time of trial, which is when the testimony is, of course, the Munoz's have had their property condemned. It's been foreclosed. Then it was condemned against the bank. They've lost their house in a foreclosure to the bank. They're in personal bankruptcy. They did not spend time after they closed the business in April of 2004 and trial saying, well, what are we going to do with the business? That would be illogical. But I'm still hung up on what was the harm to them as a result of this uncertainty? The ACME moved out. That was 25 percent of their business, right? I don't remember the number, but that sounds familiar. So that's got nothing to do with this particular uncertainty. The ACME just moved out. Yes. There's two. How much did their business decrease from the time they got it, what, when they got it, what, 2002, spring of 2002, or when in 2002? When they bought it? Yes. I think maybe August of 2001. And what was the business at that point in time? The amount of sales, I don't remember that number. But I do concede, in fact, it's essential to the case, that the business was in trouble by September of 2002. And that's exactly the point. So the business was in trouble by 2002, and we know that at least by the end of April 2003, nobody really knew whether this property was in or out. Culbertson was lobbying Marino, et cetera. It sounds to me like this was a business that was on life support at that point in time. Well, the testimony in trial was that it was not on life support. The testimony in trial was that the business was fragile. And that's so important to rights like these under the Uniform Relocation Act, because the statute is designed. But clearly this business was doing significantly poorer in the spring of 2003 than it had been in late 2001, 2002, and early 2003, or certainly 2001 and 2002, right? Certainly than 2001 and the first half of 2002. I don't remember the exact numbers, but that's exactly my point, Judge. The business, of course, was fragile. There was a CVS pharmacy. Was the CVS moved out or was it the Acme that closed? No, the Acme. The Acme closed. My point about the CVS is there was a CVS across the street. When you have rumors of condemnation, when people start to move out, the businesses that are left suffer quickly. When did the Acme move out or close? I don't remember that date. But my point about the CVS is a CVS is indestructible. Nino's Farmer's Market, owned by the Munozes, is fragile. That's why the confusion, the beginning of the condemnation process, was what killed Nino's. And again, I come back to the point that I was making before. What the city says is, because they didn't give us notice. They don't say the because part. I say the because part. Because we didn't get notice, we weren't doing things in 2004 that the city wants us to tell them at trial, and here we would have done. Like, oh, see that piece of property a half mile away? We would have told the city to acquire that one. The Munozes had no opportunity to do that. I'm not sure whether the court would like me to address any of the private right of action information. In the time you have left. I can do that mostly through. The first claim is that this shall, this right, is given in regulation, and that cannot create an individual right of the Munozes. Yeah, that's answered. That's answered very simply by the Three Rivers Center case, a Third Circuit 2004 case cited in our brief in page 58. The Three Rivers Center case says that when regulations are consistent and define or flesh out statutory language, they do provide enforceable 1983 rights. And here when you look at the statute in 4625A. Was there regulation in Three Rivers Center? Excuse me? Was there regulation? Yes, there was a regulation. And how did that distinguish South Camden? I'm unfamiliar with South Camden. I'm only relying on the Three Rivers case and the way it describes the relationship between regulations and the statute in a case such as this. Also, another case that we cite, Price against, that's a Ninth Circuit case. Price against Stockton, Ninth Circuit 2004, also says at page 1112, footnote 6, exactly the same thing. In that instance, they're dealing with a statute that is very similar in structure to the Uniform Relocation Assistance Act. They're dealing with the Housing Community Development Act and the regulations that support that. And in Price, just like Three Rivers, it says that when the regulations are consistent and provide a specific definition to what the statute requires, it provides an enforceable 1983 right. You know, I don't have Three Rivers here, but I know I wrote South Camden. And South Camden says the regulation cannot create an enforceable right through Section 1983 where the alleged right does not appear explicitly in the statute, but appears only in the regulation. And South Rivers cited that and cited South Camden. I mean, maybe I have to re-read South Rivers. Three Rivers. But according to the memo I have on the thing, Three Rivers cited South Camden, which is inconsistent with what you're telling me. Well, I don't think so. My recollection from having prepared the brief is that what Three Rivers said and the regulation and the statute at issue in Three Rivers was sufficiently applicable in this case to decide the issue. I wish I remembered specifically, but I suspect that Three Rivers was citing South Camden for the principle. And I don't think there's any disagreement about the principle. The principle is if the regulation is consistent with and fleshes out and defines the right, then something specific in the regulation. If the regulation interprets the statute as saying that there is a right, you can get by. No, but the statute has to create a right to a cause of action. Yes. And given in 30 seconds the whole series of cases, including Gonzaga, Blessing, and the newer parents case that this court decided a week or two ago, focus on does the regulation deal with the entity and are the people to be benefited, everybody in the world or every child in the United States, or is it specific?  The regulation focuses on the people whose property is to be condemned and the notices and information and services and money that they are to get. Thank you very much. Thank you. Mr. Gottlieb. Just a few points, judges. On the question about how, Judge Ambrose's question about how Three Rivers distinguished South Camden. Three Rivers did not need to distinguish South Camden because Three Rivers held there was no private right of action. Three Rivers ultimately said we don't have to look at the statute in this case because there's no rights-creating language under the regulation itself. In some cases what they'll say is that the regulation is merely putting, implementing what the statute was intended to say. Right, and this is, one could certainly make a good argument that that may not get you there, but that's, Judge Rodriguez has a question. In Three Rivers what they were saying was that the regulations were not enforceable under 1983 because they did not articulate personal rights. Is it a question that if the regulation articulates personal rights they would be enforceable? No. No, they didn't need to address the question or the point that I'm positing here, which is that if there's personal rights under the statute, then you look to see what the regulation says about those personal rights. It's just what Judge Greenberg was describing before was articulated in South Camden. Three Rivers quotes South Camden and says, a plaintiff can only enforce a regulation under Section 1983 if the regulation merely defines the specific right that Congress already has conferred through the statute. So you don't look to the regulations until you find a right in the statute itself, which leads us back to does 4625A confer a right? And under Newark Parents and under Gonzaga it doesn't. It's focused upon the regulated entity, not the individual. It's vague. It refers to language like minimize adverse impacts, which can't possibly be construed as specific enough to confer a private right of action. So that's the private right of action point. In the private right of action, didn't the Newark Parents case, didn't Judge Barry make a distinction between the act she was interpreting and the Medicaid Act and the words within the Medicaid Act, which then did create a 1983 action? Well, that was Sabri. That's correct. She was distinguishing this Court's opinion in Sabri, and Sabri did have rather sort of specifically individual tailored language. It talked about providing benefits to an eligible individual. The word eligible itself was important to the Court in Sabri because eligible implies that you're going to get something. There's nothing like that in this case. I hear that if it says to the displaced person. Well, it says that what it says about the displaced person, two responses to that, Judge. First, what goes to the displaced person is remarkably vague. What goes to the displaced person is that the agency has to recognize problems and solve them. That's what goes to the displaced person as opposed to benefits. Benefits you can get your hands on. It's a monetary entitlement, and that was Sabri. In this case, it's solving problems that goes to the displaced person. That's not specific enough. And, in fact, if you look at Newark Parents, Newark Parents specifically said that notice to the parents. If you look at the statute in Newark Parents, the words to the parents is used in the statute, but that wasn't individually focused either. If I may make two more quick points just on the demise of the business. In 2000, the year before the sale, the business did $2.6 million in business. In 2002, the year after the sale, it did $0.8 million in business, so it had a $1.8 million drop-off in business. In Mr. Gordon's relocation theory, the theory that he described, they're assuming that they're going to get services from the city, but they don't have any right to services. Services only come when they're ultimately displaced, but they don't even claim that there was an actual displacement at that point, and they don't try to get the services. So the services would not have possibly been a way to establish damage in this case. And my last point was just to answer your question, Judge Ambrose, about when is interest triggered. And again, you only need to reach the question when interest is triggered if you disagree with us on our private right of action argument. But if you disagree with us on the private right of action argument, interest is triggered upon the mayor's signature. That's exactly what HUD thinks. We cite a HUD letter in this case. HUD agrees with us on this, that interest is triggered by the mayor's signature. Now, it may sound a little bit counterintuitive. It may sound like it's too late. But if you think about it, how else do you identify the city's interest? You can't identify it by Ms. McCulloch. We found out that she might have thought about it, but a lot happened after the time she thought about it. You can't identify it by April of 2003, because all that happened in April of 2003 was they met with Councilman Mariano. There's an allegation that Councilman Mariano's staffer responded by saying, quote, it's a go. But that language is admittedly hearsay. So there's no affirmative support for that. And in any event, his staffer is not, Councilman Mariano's staffer is not authorized to state when the city is going to condemn a property. In fact, the city can't form an interest until the mayor himself forms the interest. But again, you don't need to reach this issue. The private right of action, the regulation only comes into play if 4625 somehow creates a private right. Thank you very much. Thank you to both Council for helpful arguments. We'll take the matter under advisement.